**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PAYAL K.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 18 C 7867** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey I. Cummings** |
| **ANDREW SAUL, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Payal K. ("Claimant") brings a motion for summary judgment to reverse or remand the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for childhood disability benefits. The Commissioner brings a cross-motion seeking to uphold the prior decision. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §405(g). For the reasons that follow, Claimant's request for summary judgment (Dckt. #15) is granted and the Commissioner's motion for summary judgment (Dckt. #19) is denied.

**I.    BACKGROUND**

**A.    Procedural History**

Claimant filed applications for childhood disability benefits back in 2012 alleging that she became disabled in 1988 (when she was 16-years old) due to bipolar disorder. Her applications were denied initially and on reconsideration. (R. 85-93.) Claimant filed a timely request for a hearing, which was held on May 16, 2013 before Administrative Law Judge

---

[1] In accordance with Internal Operating Procedure 22 - Privacy in Social Security Opinions, the Court refers to Claimant only by her first name and the first initial of her last name.

("ALJ") Steven Templin.  (R. 53-79.)  On February 19, 2014, ALJ Templin issued an unfavorable decision denying Claimant's applications for childhood disability benefits.[2]  (R. 19-48.)  Claimant filed a timely request for review of that decision, which was denied by the Appeals Council on June 25, 2015.  (R. 1-11.)

Claimant then filed an action in the District Court, *see* Case No. 15 C 7427, seeking judicial review of the ALJ's decision.  As explained in more detail below, on November 2, 2016, Judge Leinenweber granted Claimant's motion for summary judgment and remanded her case back to the Social Security Administration for further proceedings.  *Kapoor v. Colvin*, No. 15 C 7427, 2016 WL 6496049, at *1 (N.D.Ill. Nov. 2, 2016); (R. 509.)  On remand, ALJ Templin held another hearing and considered additional evidence, but again denied Claimant's applications for childhood disability benefits in a written opinion dated August 1, 2018.[3]  (R. 362-375.)  This action followed.

As Judge Leinenweber previously explained, "[t]here is no question that [Claimant] currently suffers from a mental disability."  *Kapoor*, 2016 WL 6496049, at *1.  Indeed, the administrative record reveals that Claimant applied for and was granted Supplemental Security Income ("SSI") benefits in 2010.  (R. 56, 568.)  Instead, at issue here is the ALJ's decision to deny Claimant's applications for childhood disability benefits because she failed to show – as she must – that she was disabled prior to turning 22 years old on December 30, 1993.  Thus, the Court focuses on the evidence most relevant to our review of that denial.

---

[2] Claimant filed multiple applications for benefits including on her own account, and that of her mother and deceased father.  Accordingly, the ALJ issued two essentially identical opinions on February 19, 2014.  (Compare R. 19-30 with R. 37-48.)

[3] Again, the ALJ issued two substantively identical opinions on August 1, 2018 in light of Claimant's multiple pending applications.  (Compare R. 362-75 to R. 386-99).

### B.    The Standard for Proof of Disability Under the Social Security Act

To qualify for childhood disability benefits an adult individual must, among other things, establish that she became "disabled" under the Social Security Act before she turned 22 years old. *Toliver v. Berryhill*, No. 17 C 4000, 2018 WL 6398912, at *1 (N.D.Ill. Dec. 6, 2018). A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months."[4] 42 U.S.C. §423(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. §404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. §404.1520(a)(4)(i). It then determines at step two whether the claimant's physical or mental impairment is severe and meets the twelve-month duration requirement noted above. 20 C.F.R. §404.1520(a)(4)(ii). At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the individual is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. §404.1520(a)(4)(iii).

---

[4] The analysis for childhood disability claims is essentially the same as it is for Disability Insurance Benefits and Supplemental Security Income claims, except that a claimant must establish that she became disabled before turning 22. *Tolefree v. Berryhill*, No. 17 C 4000, 2018 WL 4538783, at *4 n.7 (N.D.Ill. Sept. 21, 2018).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines her exertional and non-exertional capacity to work. The SSA then determines at step four whether the claimant is able to engage in any of her past relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, she is not disabled. *Id*. If the claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of her RFC, age, education, and work experience. An individual is not disabled if she can do work that is available under this standard. 20 C.F.R. §404.1520(a)(4)(v).

**C.    Evidence Presented to the ALJ in Advance of the First Decision Denying Childhood Disability Benefits**

**1.    Evidence from Claimant's Treating Physicians**

The record includes a "Discharge Card" – but no accompanying treatment records – from Holy Family Hospital in Bombay, India from 1988. (R. 252.) The date of admission is November 23, 1988 and the date of discharge is December 12, 1988. (*Id*.) Claimant's age is listed as 16 years old and the diagnosis is listed as "psychosis." (*Id*.) Additionally, as Judge Leinenweber explained in his opinion, prescription records from India also show that:

> Over the course of several months [in 1988], [Claimant] was prescribed a bewildering array of different medications. Records indicate that doctors in India continued to modify her drug regimen for several years, including during the years 1989, 1990, and 1993-95. The number of prescriptions written by her doctors during this time totals at least 55, although some of the same drugs appear multiple times, only in varying quantities.

*Kapoor*, 2016 WL 6496049, at *1 (citing R. at 254-267.) Those prescriptions were first prescribed by psychiatrist Dr. Pinto and later by psychiatrist Dr. Sheth. However, like the discharge card, there are no accompanying treatment records with the prescription records and this is the full extent of the medical records related to Claimant's treatment prior to her 22nd birthday in 1993.

4

The remainder of the records relate to Claimant's treatment in the United States after she moved here with her family in 1997, and well after she turned 22. Those records reveal a long history of treatment in her adult life – namely medication and psychiatric visits and admissions – for severe mental illness, usually described as schizoaffective disorder, bipolar type. (R. 280-309.) For example, in 2002, Claimant was hospitalized for delusional, manic, and aggressive behavior after a period of non-compliance with her medication. (R. 270-75.) Claimant has apparently been hospitalized on a number of other occasions since 2002, though the record does not include any of those hospitalization records. (R. 329.)

More recent progress notes from 2007-08 with psychiatrist Dr. Christopher Blank show abnormal behaviors and thought processes, and medication non-compliance. (R. 312.) Dr. Blank continued to diagnose Claimant with schizoaffective disorder, bipolar type, and continued treating her with medication, including Tegretol and lithium. (R. 312-19.) The record also reveals that Claimant moved out of the family home and into a group home in 2012 after her father passed away. (R. 74.)

Dr. Blank submitted a letter to the ALJ in connection with the first hearing. (R. 356-57.) Dr. Blank explained that he treated Claimant for three to four years "for both psychotic symptoms and bipolar mood symptoms (mania and depression)" and diagnosed her with "schizoaffective disorder, bipolar type." (R. 356.) Dr. Blank then reviewed the medications Claimant was prescribed to claimant as a child in India, listing each one by brand name and generic name, and providing a brief explanation of what each medication is typically used for. (R. 357.) According to Dr. Blank, the medications prescribed to Claimant in India "can and are used to treat" symptoms of psychosis, mania and/or depression – "exactly the symptoms I know [Claimant] to have." (R. 357-58.) Further, Dr. Blank stated that the medications prescribed in

India are "EXACTLY the kinds of medications she has been treated with in the United States."
(*Id*. (emphasis in original).)

### 2.    Evidence from Agency/Consulting Physicians

At both the initial and the reconsideration levels, the agency physicians found that there
was "insufficient evidence" to determine whether claimant had a medically determinable
impairment prior to turning 22.  (R. 339, 355.)  And, although Claimant underwent a consultative
examination in 2010 (presumably related to her application for SSI), that consultation related
primarily to Claimant's condition at that time.  (R. 328-32.)  The consulting physician did report
that Claimant's mother explained that she was "unaware of her daughter's illness until they
received a call from her college around 1997 because [Claimant] attempted to jump out of a
window."  (R. 329.)  Claimant's mother also explained that Claimant tried to work a few times in
India, but that only lasted a few days because she complained that her coworkers were "too
personal."  (*Id*.)

### 3.    Claimant's Mother's Testimony at the 2013 Hearing

At the first hearing before the ALJ in 2013, Claimant's mother and legal guardian Lalita
appeared and testified on Claimant's behalf.  Lalita explained that the family moved from India
to the United States in 1997 and she immediately sought medical care for Claimant.  (R. 63-64.)
It was at that point that Lalita first heard the term "bipolar" as a diagnosis for her daughter.  (R.
64.)  However, according to Lalita, Claimant's symptoms date back to her teenage years ("16,
17, 18"), which was when she was first hospitalized in India.[5]  (R. 66, 68.)

Specifically, Lalita described Claimant's behavior in India as much worse than in the
United States, "very severe," and "unimaginable."  (R.  66.)  She explained that Claimant was

---

[5] In advance of the hearing, Lalita submitted an affidavit indicating that Claimant's "fragile mental state
began when she was 16 and has been with her despite medications since that time."  (R. 247.)

unpredictable and reclusive, and the family feared that she would jump out of their eighth story apartment. (R. 67.) Lalita decided to hospitalize Claimant in India in 1988 when she began taking off her clothes and walking around the apartment. (R. 67-68.) According to Lalita, Claimant was first under the care of Dr. Pinto in India but, after seeing little improvement, transferred to Dr. Sheth in 1991, who started Claimant on the same medicines she still takes today, namely lithium and Tegretol. (R. 68, 71-72.) Lalita explained that Claimant was often noncompliant with her medication while in India. (R. 68.) Lalita also testified that Claimant underwent counseling every two weeks under the care of Dr. Sheth. (R. 71.)

Lalita explained that despite Claimant's severe symptoms, she was able to obtain a bachelor's degree in a four or five-year college program (which starts at age sixteen in India) and obtain a master's degree in two years. (R. 68-70.) However, Lalita explained that the only reason Claimant was able to obtain these degrees is because she had a tutor for three to four hours a day and her family members helped her significantly on a day-to-day basis. (R. 69.) Claimant completed the master's program solely through correspondence classes because she had difficulty interacting with other students. (R. 70.) Lalita confirmed that Claimant has never maintained a job outside the home. (R. 63-64.)

As for Claimant's more recent condition, Lalita stated that she is much calmer because she is more compliant with her medication regimen. (R. 72-73.) But, despite her improved condition, Lalita explained that Claimant moved out of the family home and into a group home in 2012 due to added family stress after the death of Claimant's father and Lalita's own health problems. (R. 74-75.)

### 4.    Medical Expert's Testimony from the 2013 Hearing

Medical expert ("ME") Kathleen O'Brien, a licensed clinical psychologist, also appeared and testified at the first hearing before the ALJ.  ME O'Brien testified that there was not enough evidence to evaluate Claimant's condition before she turned 22.  (R. 59.)  In her view, the records from India were not "interprable [sic] in American psychology."  (*Id*.)  She opined that Claimant's ability to receive a bachelor's degree and a master's degree in India suggested that Claimant's difficulties might not have been as severe as alleged, but that there is "absolutely no way to go back" and determine her level of functioning.  (R. 61.)  When Claimant's attorney asked the ME if she was familiar with any of the medications prescribed to Claimant in India, the ME stated that she had "no idea" what the brand name medications "are about."  (*Id*.)  According to ME O'Brien, the cultural differences in treatment also made it difficult to assess any treatment records from India.  (R. 60.)

### D.    The ALJ's First Decision

Based on all of the above evidence, ALJ Templin issued his first decision denying Claimant's application for childhood disability benefits in February 2014.  (R. 19-30.)  In doing so, ALJ Templin followed the requisite five-step inquiry outlined above.  At step one, he determined Claimant had not engaged in substantial gainful activity at any time because she never maintained employment.  (R. 22.)  The ALJ then went on to assess whether Claimant had a severe medically determinable impairment before the age of 22, ultimately concluding that she did not.

In reaching his conclusion, the ALJ reviewed all of the evidence, emphasizing that there was minimal medical evidence prior to Claimant's 22nd birthday.  Citing Social Security Ruling ("SSR") 83-20, the ALJ explained that medical records – of which there were few prior to 1993

– are "basic to the determination of the onset of disability." (R. 25.) In the ALJ's opinion, while the record included a diagnosis of psychosis in 1988, a list of prescriptions, and subsequent treatment in adulthood for severe impairments, the record did not establish the impact, if any, of Claimant's symptoms on Claimant's functioning before she was 22. (*See* R. 26 – "[T]here is no documentation of how she was functioning on a daily basis, description of her ability to engage in or maintain social relationships, her cognitive capacity, or whether she was able to maintain concentration, persistence, or pace.") He cited and relied on ME O'Brien's opinion that "the record was insufficient to establish that the claimant had a severe mental impairment before attaining age 22." (R. 24.)

And, although the ALJ also considered Claimant's mother's testimony that Claimant's condition in India was essentially the same as it was in the United States, he discounted that testimony. He pointed out that Lalita later told the consultative examiner that she was unaware of Claimant's condition until much later in 1997, and also questioned Claimant's ability to obtain college and graduate degrees (and her attempts to work in India) if her symptoms were as severe as her mother alleged.

ALJ Templin also considered Dr. Blank's explanation that the prescriptions in India were identical to those prescribed in the United States. The ALJ agreed that those prescriptions and the discharge card showed that Claimant exhibited "abnormalities of thought and behavior that were so obvious as to necessitate medical intervention." (R. 29.) However, he ultimately concluded that the evidence was insufficient to show that Claimant suffered from a medically determinable mental impairment prior to 1993 that severely affected her functional capacity. (R. 29.)

### E.     Judge Leinenweber's Opinion on Appeal

Claimant appealed the ALJ's first denial to the District Court and Judge Leinenweber ultimately granted her request for remand after finding several errors in the ALJ's opinion.  He described those errors as follows:

> First and most important, [the ALJ] relied on the statements of medical expert Dr. O'Brien, who provided conclusory and uninformed testimony at the May 16 hearing.  In questioning Dr. O'Brien, the ALJ failed to elicit even minimally useful information that would support his decision.  Although the ALJ states that he gave the opinion of Dr. Blank – [Claimant's] treating psychiatrist – great weight, Dr. Blank's opinion contradicted points made by Dr. O'Brien.  The ALJ did not indicate how, if at all, he reconciled the contradictions.  Finally, the ALJ wrongly discounted the testimony of Ms. Kapoor regarding [Claimant's] condition while in India.

*Kapoor*, 2016 WL 6496049, at *2.  Specifically, Judge Leinenweber questioned the conflict between ME O'Brien's inability to identify any of the medications prescribed in India and Dr. Blank's ability to identify each medication by name and purpose and link them to Claimant's current symptoms and medications.  As for the ALJ's treatment of Claimant's mother's testimony, Judge Leinenweber took issue with the ALJ's decision to weigh Claimant's ability to obtain two degrees against her mother's testimony of severe impairments given the explanation for *how* Claimant obtained those degrees (*i.e.* a tutor and family support).  He also faulted the ALJ for holding Claimant's few (but unsuccessful) attempts to get a job against her mother's testimony.

Ultimately, Judge Leinenweber found that there was not an accurate and logical bridge from the evidence to the ALJ's conclusion.  Though he did not "conclude that [Claimant] [was] definitely entitled to [childhood disability benefits]," he remanded the matter for further proceedings consistent with his opinion.  *Id*.

10

### F. Supplemental Evidence Presented to the ALJ on Remand

On remand, the case was returned to ALJ Templin, who sought additional evidence and conducted another hearing. That evidence is as follows.

### 1. Supplemental Witness Statements

Claimant submitted letters from her uncle and brother describing her condition in her younger years. (R. 734-35.) Claimant's brother explained that he first noticed "unusual behavior" when Claimant was thirteen and things "kept getting progressively worse from there." (R. 735.) He explained that Claimant had "drastic mood swings" and overreacted over small things. (*Id*.) Although the family physician wrote this off as normal teenage behavior, Claimant's brother stated that things got worse and Claimant "experienced her first nervous breakdown in 1988." (*Id*.) Claimant's brother also confirmed that Claimant was able to complete her studies with the "help of private tutors at home." (*Id*.) Eventually, Claimant's brother moved to the United States without his parents because Claimant's condition was negatively affecting his life. (*Id*.)

Claimant's uncle, who resided in the United States, visited Claimant and her family periodically in India. (R. 734.) Claimant's uncle viewed Claimant as a normal, well-behaved child during visits at ages three and eight. (*Id*.) Only when she was thirteen did Claimant's uncle notice some "abnormal" behavior, which he chalked up to typical teenage behavior. (*Id*.) He did not see her again until she was 23. By that time, Claimant's uncle had heard of her "nervous breakdown," but he observed Claimant was "by and large a well behaved and delightful person as long as she was taking medicine in a proper regimented dose." (*Id*.) After

Claimant moved to the United States, he noticed more erratic behavior, including mood swings, incomprehensible speech, and refusal to take medication.  (*Id*.)

### 2.    Supplemental Hearing Testimony

At the supplemental hearing in November 2017, the ALJ explained that he twice requested that the SSA schedule a psychiatrist to serve as a mental expert to better elaborate on Claimant's medications.  (R. 790.)  However, the SSA scheduled psychologist Dr. Michael Carney to serve as the ME, which prompted the ALJ to issue the interrogatories described below to psychiatrist, Dr. Benedek.

Nonetheless, ME Carney did offer testimony at the hearing.  The majority of that testimony related to Claimant's records and condition after she moved to the United States.  For example, ME Carney reviewed the various diagnoses reflected in the medical records and opined that the "schizoaffective disorder, bipolar type" diagnosis "seems appropriate in this case," and also acknowledged the indications and documented symptoms of schizoid personality disorder and obsessive-compulsive disorder.  (R. 792, 796-97.)

Based on his review of the record, ME Carney opined that Claimant had moderate limitations in understanding and remembering information; marked limitations in interacting with others; marked limitations in maintaining concentration, persistence, and pace; and marked limitations in adapting and self-management.  (R. 798-99.)  The ALJ then asked the ME whether an individual with such limitations would be capable of obtaining the type of advanced degrees Claimant obtained in India.  (R. 799.)  The ME responded, "I wouldn't think so…unless [she was] taking meds at various times" because it would be difficult to interact with others in person and even to complete those degrees remotely.  (R. 799-800.)  However, he further opined that

perhaps "if she did it over a period of time," it might be possible, though "not probable."  (R. 808-09.)

When asked whether the ME could "extrapolate" Claimant's extreme symptoms reflected in the more recent medical records back to when she was 22, the ME pointed out that the only evidence from that period was the discharge card and the prescription lists.  (R. 816-17.) Although Dr. Carney didn't recognize all of the medications on those lists, he did recognize some and also reviewed Dr. Blank's letter connecting those medications to Claimant's later treatment and symptoms.  (R. 817-18.)  ME Carney also identified Tegretol as a medication used to treat mania and Anafranil as a medication to treat OCD.  (R. 818.)  While ME Carney testified that the medications prescribed in India were "heavy duty medications," he ultimately agreed that a list of medications and one hospitalization alone do not indicate how functional Claimant was at the time or whether any of her symptoms were well-controlled with medication when compliant.  (R. 819, 821-22.)  Generally speaking, the ME did testify that 18-21 is a common age range for the first episode for a schizoaffective bipolar type patient to occur.  (R. 804.)

Claimant's mother also appeared at the supplemental hearing and again explained that the only reason Claimant completed her college and master's degrees was because of the tutor and the constant family assistance for the remote learning.  (R. 805-06.)  Otherwise, Claimant's mother's supplemental testimony related mostly to her recent living condition since leaving the group home (in an apartment by herself), her minimal activities of daily living, and her continued symptoms.  (R. 813-16.)

### 3.    Supplemental Evidence from Agency/Consulting Physicians

Following the second hearing, the ALJ submitted medical interrogatories in checklist format to consulting psychiatrist Dr. Benedek, asking her to review the medical record and assess

whether it was sufficient to determine the severity of Claimant's mental impairments from the alleged onset date of 1988. (R. 780-83.) Dr. Benedek responded that the record was sufficient and that Claimant's established disorders are "schizoaffective disorder, bipolar type" and "schizoid personality disorder." (R. 782.) She opined that Claimant had marked limitations in understanding, remembering, and applying information and extreme limitations in interacting with others, concentration, persistence, and maintaining pace, and adapting and self-management. (R. 783.) When asked to identify the earliest date that Dr. Benedek could find "such severity and why," Dr. Benedek listed the prescription records that reflected prescription dates back in 1988-1993 and Dr. Blank's letter regarding those medications. (*Id*.)

    **G.    The ALJ's Second Decision**

In his most recent opinion, the ALJ again began with the five-step analysis. At step one, he determined, as before, that Claimant had never engaged in substantial gainful activity. (R. 367.) The ALJ then went on to step two and elaborated further that although the medical evidence *does* establish that the Claimant "had a bipolar type of schizoaffective disorder and a schizoid personality disorder before she attained age 22," – as evidenced in part by the medications prescribed – the medical evidence *does not establish* that she had at least one severe "medically determinable mental impairment before she attained age 22" for purposes of disability evaluation. (R. 367-369.) In his second opinion, the ALJ attempted to "focus upon the main thrust of the memorandum opinion and order" from Judge Leinenweber and to better articulate the explanation as to *why* he did not find that the medical evidence of record supported a finding of a severe mental impairment prior to age 22. (R. 369.) Ultimately, he again concluded at step two that Claimant failed to show the existence of a medically determinable

impairment at the relevant time period and was thus not disabled for purposes of childhood disability benefits. (R. 375.) The instant action for judicial review followed.

### H. Claimant's Arguments for Remand

On this second appeal to the District Court, Claimant continues to argue that the ALJ improperly weighed the testimony of Claimant's mother Lalita regarding Claimant's limitations before age 22. According to Claimant, despite Judge Leinenweber's admonishment, the ALJ once again discredited Lalita's testimony of extreme limitations because it conflicted with Claimant's ability to complete college and graduate school. Claimant also argues that the ALJ's "complete dismissal" of Dr. Benedek's opinion was improper as he failed to explain what evidence conflicted with her opinion. Lastly, Claimant argues that the ALJ failed to properly follow SSR 83-20 when he placed too much stock in the lack of medical records and failed to focus on the other evidence, such as Claimant's non-existent work history, and her mother's testimony.

In response, the Commissioner argues that the ALJ's decision is supported by substantial evidence because he properly considered and weighed all of the evidence of record, including the medical records, Lalita's testimony, and the opinions of the medical experts. While sympathizing with Claimant's plight and acknowledging the Agency's 2010 approval of Claimant's SSI application, the Commissioner argues that Claimant has simply failed to meet her burden of proving disability before age 22.

## II. ANALYSIS

### A. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C.

§405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Consequently, this Court will affirm the ALJ's decision if it is supported by substantial evidence. *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015). "Substantial evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted). The Commissioner's decision must also be based on the proper legal criteria and free from legal error. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent symptom evaluations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

**B.    The ALJ failed to abide by the law of the case when re-assessing Claimant's mother's testimony on remand**

Under the law of the case doctrine, to the extent that Judge Leinenweber *decided* an issue "either expressly or by necessary implication," his "decision [is] binding upon all subsequent proceedings in the same case." *Surprise v. Saul*, 968 F.3d 658, 663 (7th Cir. 2020), *quoting*

*Dobbs v. DePuy Orthopaedics, Inc.*, 885 F.3d 455, 458 (7th Cir. 2018).[6]  Thus, the doctrine

requires that an "administrative agency, on remand from a court, conform its further proceedings

in the case to the principles set forth in the judicial decision...."  *Poppa v. Astrue*, 569 F.3d 1167,

1170 (10th Cir. 2009) (citation omitted); *see also Surprise*, 968 F.3d at 663*, quoting Law v.*

*Medco Research, Inc*., 113 F.3d 781, 783 (7th Cir. 1997) ("The law of the case doctrine thus

requires a lower court 'to conform any further proceeding on remand to the principles set forth in

the appellate opinion unless there is a compelling reason to depart.'").  The law of the case

doctrine is a corollary to the "mandate rule," which further "requires a lower court to adhere to

the commands of a higher court on remand."  *Carmody v. Bd. of Trustees of Univ. of Illinois*, 893

F.3d 397, 407 (7th Cir. 2018); *see also Sullivan v. Hudson*, 490 U.S. 877, 886 (1989) ("Deviation

from the court's remand order in the subsequent administrative proceedings is itself legal error,

subject to reversal on further judicial review.").

　　　The law of the case doctrine comes into play where a court has "actually decided" a

particular issue but "[i]f an issue is left open after remand the lower tribunal is free to decide it."

*Carmy M. v. Saul*, No. 19 C 4032, 2020 WL 5439982, at *2 (N.D.Ill. Sept. 10, 2020)*, quoting*

*Surprise*, 968 F.3d at 663.  As another court recently explained in the context of a social security

disability appeal:

> [A] ruling that evidence was insufficient to support some finding is the type of
> ruling that establishes the law of the case.  On the other hand, where a court's
> ruling instructs the ALJ to build a logical bridge that had been missing, the law of
> the case doctrine does not apply.  In other words, if the court's directive to the

---

[6] Although Claimant does not raise the law of the case doctrine by name, she effectively invokes the
doctrine with her argument that the ALJ ignored Judge Leinenweber's opinion by continuing to discount
her mother's testimony regarding Claimant's limitations in India because she was able to complete
college and graduate school.  (*See* Dckt. #15 at 3 ("Despite [Judge Leinenweber's admonishment], the
ALJ has once again discounted [Lalita's] testimony") and Dckt. #21 at 3 ("In his most recent opinion, the
ALJ persists in this line of rationale, despite being admonished by this Court")).  The Court views this as
an argument by Claimant that the ALJ failed to follow the law of the case.

> ALJ is to provide a more thorough analysis, the law of the case doctrine would not prevent the ALJ from relying on the same evidence when unspooling it with more thorough explanation on remand.

*Carmy M.*, 2020 WL 5439982, at *2 (internal quotations and citations omitted). Whether an ALJ violated the law of the case is best determined "by carefully considering the scope of the district court's remand order." *Key v. Sullivan*, 925 F.2d 1056, 1061 (7th Cir. 1991).

In this case, although Judge Leinenweber did not hold that Claimant was entitled to childhood disability benefits and left that determination to the ALJ on remand, he did make certain decisions that implicate the law of the case doctrine with respect to the testimony of Claimant's mother, Lalita.[7] In particular, Judge Leinenweber reviewed the ALJ's assessment of Lalita's testimony "about the severity of [Claimant's] illness while the family resided in India, the effect on [Claimant's] life, and the continuation (and improvement) of symptoms after the family relocated to the United States" and held that the ALJ discounted her testimony for "improper reasons." *Kapoor*, 2016 WL 6496049, at *4. In particular, Judge Leinenweber held as follows:

> First, the ALJ believed that Payal's achievement of a bachelor's and master's degree while she was in India negated much of what Ms. Kapoor said about her daughter's day-to-day difficulties. It makes no sense to hold Payal's accomplishments against her in this regard. Ms. Kapoor testified that the accomplishments were only possible with the help of a tutor, with help from the

---

[7] Judge Leinenweber also held that ME O'Brien's "conclusory and uninformed testimony" at the first hearing was "insufficient" to support the ALJ's denial because "the ALJ failed to elicit even minimally useful information [from ME O'Brien] that would support his decision." *Kapoor*, 2016 WL 6496049, at *2. Had the ALJ continued to rely on ME O'Brien's testimony in his second decision, this would have violated the law of the case doctrine. *See Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998) ("A ruling that evidence was insufficient to support some finding is the type of ruling that establishes the law of the case.") However, as discussed above, the ALJ heard testimony from a second medical expert, Dr. Carney, and sought and received interrogatories from Dr. Benedek in order to address the Court's concerns regarding the medical expert testimony. Consequently, the ALJ did not violate the law of the case with respect to Judge Leinenweber's ruling regarding ME O'Brien. *See Sayles v. Barnhart*, No. 03 C 7325, 2004 WL 3008739, at *16 (N.D.Ill. Dec. 27, 2004) (finding the ALJ did not violate the law of the case where she "elicited additional testimony from a second [vocational expert]" to address prior shortcomings in her analysis).

entire family, and through correspondence classes.  She described it as a miracle.
Ms. Kapoor also has described Payal as a "good student" when speaking to
physicians on at least two occasions.  (*See*, AR at 291, 329.)  In his decision, the
ALJ implied that such a description was at odds with Ms. Kapoor's other
testimony describing her daughter's hardships; the ALJ possibly used the
comment as a reason to discredit her.  (*See*, AR at 44, 46-47.)  If so, that was a
blatant mistake.  It would be unfair to discount Ms. Kapoor's credibility simply
because she is proud of her daughter.

Relatedly, the ALJ believed that Payal's ability to find employment on four
separate occasions cut against Ms. Kapoor's testimony about the severity of her
daughter's condition – despite the fact that Payal failed to hold any job for more
than a few days. (*See,* AR at 247.)  As with Payal's attempt to educate herself, it
makes no sense to punish her for attempting (and failing) to find long-term work;
this is especially true for a disability like bipolar disorder, where the severity of
the symptoms may ebb and flow…The ALJ erred to the extent he refused to credit
Ms. Kapoor's testimony for these reasons.

*Id*.  Thus, although Judge Leinenweber left the door open for the ALJ to re-weigh Lalita's

testimony, he expressly found that the reasons stated by the ALJ were insufficient to discount her

testimony and thereby triggered the law of the case doctrine.  *Wilder*, 153 F.3d at 803.

In his second decision, the ALJ once more failed to credit Lalita's testimony that

Claimant's condition was "very severe" and "worse" while she was residing in her native India --

and had improved over time -- based on the fact that Claimant was able to obtain college and

master's degrees while in India.  (*See* R. 371 ("if claimant's mental disorders had been this

medically severe, her ability to obtain a college degree, let alone a post graduate degree would

have been more than a 'miracle.'")  The ALJ's continued reliance in his remand decision on a

reason ruled out of bounds by Judge Leinenweber was a violation of the law of the case doctrine.

This error requires remand.  *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 353–54 (7th

Cir. 2005) (The ALJ cannot implicitly reject [claimant's] testimony on this ground the second

time around under the law of the case doctrine, without pointing to evidence that furnishes

compelling grounds for departure from [the court's] ruling); *Dejohnette v. Berryhill*, No. 16 C

11378, 2018 WL 521589, at *4 (N.D.Ill. Jan. 22, 2018) ("The ALJ ignored the law of the case expressly requiring her to address Claimant's limitations specifically, and it is impossible to evaluate what weight the ALJ gave to Claimant's testimony regarding his limitations … Accordingly, remand is mandated because the ALJ did not provide sufficient explanation for her analysis."); *Daniels v. Colvin*, No. 15 C 9148, 2016 WL 7116582, at *12 (N.D.Ill. Dec. 7, 2016) ("The ALJ's logic in 2014 closely mirrors the same faulty credibility logic as she used in her 2012 decision…On its face, this is a violation of the law of the case doctrine, and as such is grounds for remand.").

The ALJ also discredited Lalita's testimony concerning the intensity and duration of Claimant's symptoms prior to 1997 based on Lalita's testimony that Claimant was living in a group home in 2012 due to inappropriate behavior whereas she was able to live at home and cooperate with Lalita and a caseworker roughly ten years earlier (*i.e.,* in 2002). (R. 371-72.) Discrediting Lalita's testimony about Claimant's condition prior to 1997 – which sweeps in Lalita's most pertinent testimony regarding Claimant's condition prior to turning 22 on December 30, 1993 – based upon the fact that Claimant was living at home in 2002 but living in a group home in 2012 seems unreasonable. Among other things, the ALJ ignores Lalita's testimony that Claimant moved into the group home due to added family stress after the death of Claimant's father and Lalita's own health conditions. (R. 74-75.) This evidence suggests that it was these reasons, and not a material worsening of Claimant's condition, that led to Claimant's move to the group home. At a minimum, the ALJ failed to build the necessary "accurate and logical bridge" from the evidence to his conclusion that Lalita's testimony regarding Claimant's condition while in India is not credible. *See, e.g., Scott,* 297 F.3d at 595.

Finally, in assessing Dr. Benedek's findings, the ALJ observed – without elaboration – that he did not find Dr. Benedek's opinions "consistent with…the majority of the testimony of the claimant's mother at both hearings that I do credit."  (R. 374.)  This abbreviated discussion leaves "[t]he Court…no more or less informed" about which portions of Lalita's testimony the ALJ credited and which portions he did not, and – more importantly – *why* he did so.  *Lewis v. Astrue*, 518 F.Supp.2d 1031, 1045 (N.D.Ill. 2007) (ALJ erred when he failed to clarify the inconsistences that partially led to the original remand order).  This too is a reversible error.  *Id.* The ALJ's failure to fully explain his analysis of Lalita's testimony is particularly concerning because she offered the only testimony regarding Claimant's symptoms and conditions prior to age 22 that the ALJ considered.[8]

In sum, the ALJ shall explain on remand which portions of Lalita's testimony he credited, which he did not, and shall explain his reasons for doing so.  The Court expects that those reasons will not conflict with Judge Leinenweber's findings.  *Kapoor*, 2016 WL 6496049, at *4. Furthermore, because Lalita's testimony also relates to the ALJ's consideration of the medical experts' testimony and the factors set forth in SSR 83-20, the Court need not address Claimant's arguments at this time.  On remand, the ALJ shall reconsider those issues to the extent necessary after a full re-assessment of Lalita's testimony and consideration of the statements of Claimant's brother and uncle.

---

[8] The ALJ also ignored the letters from Claimant's brother and uncle that Claimant submitted to explain their knowledge of Claimant's condition at the relevant time period.  *See* Section F1, above.  This was another error.  "Where, as here, a claimant is found to be disabled but it is necessary to decide whether the disability arose at an earlier date, the ALJ is required to apply the analytical framework outlined in SSR 83-20 to determine the onset date of disability."  *Briscoe*, 425 F.3d at 352.  Under SSR 83-20 (which is now superseded but applies based upon the date when the ALJ rendered his second decision), statements from family members like Claimant's brother and uncle should be considered by the ALJ on remand. *See, e.g., Mack v. Colvin,* No. 14 C 3945, 2015 WL 8481960, at *4-8 (N.D.Ill. Dec. 10, 2015); *Dory L. v. Saul,* No. 19 CV 50106, 2020 WL 5763612, at *1, 5 (N.D.Ill. Sept. 28, 2020); *Smith v. Colvin,* No. 1:12-CV-00795-TWP, 2013 WL 5309807, at *5 (S.D.Ind. Sept. 20, 2013).

## CONCLUSION

For the foregoing reasons, Claimant's motion for summary judgment (Dckt. #15) is granted and the Commissioner's motion for summary judgment (Dckt. #19) is denied.  This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion.


**ENTERED:   April 23, 2021**

**Jeffrey I. Cummings**
**United States Magistrate Judge**

!
!

22